**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **BARBARA JONES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:06-cv-0939** |
| | ) | |
| **MICHAEL J. ASTRUE,[1]** | ) | **Judge Thomas A. Wiseman, Jr.** |
| **COMMISSIONER OF SOCIAL SECURITY** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

Before the Court is Plaintiff Barbara Jones' Motion for Judgment on the Administrative Record (Doc. No. 28) and supporting memorandum (Doc. No. 30) seeking judicial review of the Commissioner's denial of her claim for Social Security Disability Insurance Benefits ("DIB") for the period of November 1, 1994 through November 17, 2000. For the reasons explained below, the Court finds that the ALJ's decision is supported by substantial evidence in the record, and that the ALJ applied the correct legal principles in reaching his decision. Accordingly, the Plaintiff's motion will be denied, the Commissioner's decision affirmed, and this matter dismissed.

**I.      INTRODUCTION**

This matter has a long and ridiculously complicated procedural history. Plaintiff filed her first application for DIB on May 19, 1995, alleging that she had become disabled on November 1, 1994. *See* Doc. No. 5, Certified Transcript of Administrative Record ("AR"), at 113.) That claim was denied initially, upon reconsideration, and finally by an administrative law judge ("ALJ") in a decision dated May 30, 1997. Plaintiff filed a timely request review by the Appeals Council, but the Social Security Administration ("SSA") lost Plaintiff's claim file. As a result, her request for review languished for several years without the SSA's ever taking any action on it.

Plaintiff filed a second application for DIB on July 28, 2000, again asserting that she had become disabled on November 1, 1994. Yet again, her claim was denied initially and upon reconsideration, and

---

[1] Michael J. Astrue replaced Jo Anne B. Barnhart as the Commissioner of the Social Security Administration on February 12, 2007. Pursuant to the Federal Rules of Civil Procedure, Commissioner Astrue automatically replaces Ms. Barnhart as the defendant in this case. Fed. R. Civ. P. 25(d)(1).

Plaintiff again requested a hearing before an ALJ. This time, after the hearing, the ALJ issued a partially favorable opinion, finding Plaintiff was disabled as of her 55th birthday (November 18, 2000) but not before. The ALJ, however, rejected Plaintiff's request that her initial application be reopened and reconsidered. Applying the doctrine of *res judicata*, the ALJ refused to consider disability on or before May 30, 1997, the date of the first ALJ decision denying Plaintiff's May 19, 1995 claim. Plaintiff requested review of the ALJ's decision.

In a decision dated October 30, 2002 (AR 149–53), the Appeals Council affirmed that portion of the ALJ's decision finding Plaintiff disabled on and after November 18, 2000, vacated the portion of the decision finding her not disabled prior to that date, vacated in its entirety the May 30, 1997 ALJ decision denying the May 19, 1995 claim, and remanded for reconsideration of Plaintiff's first and second applications for DIB for reconsideration of whether Plaintiff was disabled from November 1, 1994 through November 18, 2000. The Appeals Council specifically found that *res judicata* did not apply to the period through May 30, 1997 because the musculoskeletal listings had been extensively revised effective February 19, 2002, and further found that the ALJ's decision had failed to consider a number of questions relevant to a determination of disability in Plaintiff's case. The Appeals Council ordered the ALJ, on remand, to provide Plaintiff the opportunity to resubmit evidence for the relevant time period, since the Appeals Council had not been able to locate or to reconstruct the claim file for Plaintiff's first application for benefits and had never actually reviewed the ALJ's initial decision denying that application.

The Plaintiff appeared for a third hearing before the ALJ on January 14, 2003 (AR 761–87). In a decision dated April 9, 2003, the ALJ again denied Plaintiff's claim for benefits prior to November 18, 2000. Plaintiff again requested review by the Appeals Council, asserted that the ALJ had ignored the Appeals Council's specific instructions that he (1) evaluate the treating psychiatrist's medical opinion; (2) evaluate the consultative psychological examiner's opinion; (3) address whether Plaintiff had an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the symptoms alleged; and (4) perform a function-by-function assessment of Plaintiff's ability to do work-related physical and mental activities. Plaintiff also asserted that the ALJ improperly determined that she did not have a mental impairment despite the Appeals Council's finding that "the medical evidence shows that the claimant has a mental impairment." (*See* AR 629–36 (Request for Review of

4/9/03 Unfavorable ALJ Decision).)

In a decision issued a month after Plaintiff filed her request for review, the Appeals Council vacated the ALJ's April 9, 2003 decision and remanded the case yet again, enumerating specific areas of inquiry that the ALJ had failed to consider and providing specific instructions of issues to be resolved on remand. The Appeals Council also directed that, upon remand, the case be assigned to a different ALJ. (AR 637–42.)

Plaintiff appeared for her fourth hearing, this time before ALJ Mack Cherry, on December 3, 2003. In a decision issued December 6, 2004, ALJ Cherry also reached the conclusion, as had his predecessor, that Plaintiff was not disabled prior to November 18, 2000. (AR 18–26.) Plaintiff again sought review by the Appeals Council. This time the Appeals Council denied her request for review, finally rendering the ALJ's decision the final decision of the Commissioner.

This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. §§ 405(g) and 1383(c)(3). Although the matter was filed in late 2006, the parties spent some time wrangling over whether the Administrative Record was complete. Plaintiff' Motion for Judgment on the Administrative Record was not filed until January 1, 2008. The Commissioner, after four requested extensions of the deadline, filed his Response in opposition on July 21, 2008. Plaintiff's Reply brief was filed, after permission was granted for yet another extension, on September 23, 2008. Plaintiff's motion, having finally been fully briefed, is now ripe for consideration.

II.      THE FACTUAL RECORD

A.      Background

Plaintiff was born November 18, 1945 and was 48-years old (a "younger individual") on her alleged onset date ("AOD") of November 1, 1994. She turned 50 years old (a person "closely approaching advanced age") on November 18, 1995, and 55 on November 18, 2000. (AR 42.) See 20 C.F.R. §§ 404.1563, 404.1564, and 404.1565 (classifying individuals according to their age, education and work experience). See also the Medical-Vocational Guidelines at 20 C.F.R. Pt. 404, Subpt. P, App. 2.

Plaintiff completed the tenth grade and thus has a "limited" education, 20 C.F.R. § 404.1565(a)(3). (AR 42, 180.) She began working in 1963, at age seventeen, and worked every year but

one (1965) from then through November 1, 1994. She worked for Metropolitan Nashville & Davidson County ("Metro") from 1980 through 1994, driving a school bus. For eight of the fourteen years she worked for Metro, Plaintiff drove what she called a "wheelchair bus," on which she would load up to eight children in wheelchairs. (AR 43–44.) She developed back pain in 1994 and could no longer drive the wheelchair bus, and instead drove a regular school bus from March 1994 through the end of the 1993-94 school year, and again from the beginning of the 1994–95 school year through the end of October 1994. Plaintiff alleges that she stopped working at that time because of back pain. (AR 42.).

### B. The Medical Evidence

#### 1. 1994

Plaintiff's medical records document that she has been experiencing frequent headaches that were reportedly "worse w/ poor sleep," since before the end of 1993. (AR 592 (medical note from November 3, 1993).) Her medical history as of the end of 1993 also included a prior surgery for temporomandibular joint disorder and a total abdominal hysterectomy ("TAH"). She was already noted to be obese, and her diagnoses at that time included vascular headaches and osteoarthritis of the spine. She had symptoms, presumably abdominal pain, that caused her physician, Dr. Paul Barnett, to note in December 1993, "RO GB dis" (rule out gallbladder disease) (AR 592), and was taking medications including Estace, Prilosec, Elavil and Erythromycin. (AR 593.)

In early 1994, Plaintiff began complaining of low back pain, greater on the left than the right, and the record indicates that her pain came and went, becoming more problematic in the fall and early winter of 1994, but calming down by early 1995. More specifically, in March 1994, she underwent a lumbar spine MRI that revealed a small left paracentral disc herniation at L5-S1 causing "posterior displacement of the left S1 nerve root." (AR 623.) Her treating physician, Dr. Barnett, prescribed Prednisone, Darvocet and bed rest. (AR 593.) As of the end of March, she was doing "lots better," had minimal pain and had "[c]ut way back on Darvocet." (AR 593.) At a follow-up examination a week later, she reported less pain and no more radiation down the legs but continued to be "sensitive" in the back, and coughing still hurt. Dr. Barnett renewed Plaintiff's prescriptions for Darvocet and Prilosec, ordered physical therapy, and "urged weight loss." (AR 593.) On Dr. Barnett's orders, Plaintiff began physical therapy at St. Thomas Hospital. At her initial evaluation, the therapist observed moderate loss of lumbar range of motion and

poor posture and "body mechanic habits," and noted that Plaintiff's job, which required "prolonged sitting" was a "significant factor in her back problems." (AR 588.)

Over the next three months, Dr. Barnett prescribed or continued Inderal, Prilosec and Elavil. (AR 591.) In September 1994, Plaintiff reported to Dr. Barnett back pain of three days' duration with no leg pain. Dr. Barnett noted that she had to sit a lot to drive the bus. On examination, he assessed her as having "moderate" discomfort in lumbar spine as well as moderate limitation in hyperextension and flexion of the lumbar spine. He diagnosed "[m]echanical low back syndrome secondary to L5-S1 disk herniation" and vascular headaches. He urged weight loss, continued to recommend physical therapy, and renewed prescriptions for Prilosec, Inderal and Elavil. He noted he would consider epidural steroids if Plaintiff's pain did not resolve. (AR 591.)

He also referred her to Dr. Wesley Coker for further investigation and treatment of her back problems. Dr. Coker's November 1, 1994 "Outpatient Surgery Evaluation" recorded Plaintiff's history of migraine headaches and gastric reflux, and noted Plaintiff's current complaints included low back pain as well as pain and numbness in both legs. (AR 280–81.) A post-myelogram CT scan showed a "[p]ossible small left paracentral disc protrusion L5-S1 which appears contained in the epidural fat with minimal mass effect on the thecal sac." (AR 277–78.) On November 21, 1994, Dr. Coker performed "diskograms" at L2-L3, L3-L4, L4-L5, and L5-S1 and also gave Plaintiff foraminal steroid injections at those levels. As a result of his findings in the diskograms, Dr. Coker diagnosed L5-S1 disk prolapse with lumbar radiculopathy, degenerative L2-L3 disk, and normal L3-L4 and L4-L5 disks. (AR 285.)

Upon referral from Dr. Barnett, Plaintiff began treatment with neurologist Gregory Lanford on November 30, 1994 for further treatment of her back problems. Based on Plaintiff's report to him, Dr. Lanford described Plaintiff as having "chronic low back pain, now with increasing low back pain for the last five to six weeks" and "right greater than left leg pain." (AR 295.) Plaintiff reported having had "multiple exacerbations and remissions" over the course of the past year. She indicated the diskogram and diskal steroid shot had not resulted in much improvement of her symptoms. (AR 295.) Dr. Lanford's assessment was degenerative disc disease with "symptomatic disc protrusion at L5-S1." His plan was to treat her with epidural steroid injections. He noted she should "work as her pain allows her." (AR 295.) He sent her to Dr. Robert MacMillan at the Pain Clinic at Centennial Medical Center to perform the

epidural steroid injections on December 14, 1994.  (AR 304–05.)

### 2.    1995

Plaintiff's medical records indicate she had few back-related or other complaints in 1995.  Dr. Lanford released her to return to work as of January 19, 1995 with lifting restrictions (no more than ten pounds repetitively and 20 pounds occasionally) and no sitting for more than two hours at a time, and instructions not to operate a school bus until further notice.  (AR 600.)

On March 1, 1995, Plaintiff reported to Dr. Lanford that she was "better since starting Voltaren." (AR 294.)  His treatment note for May 31, 1995 indicates she had been "doing reasonably well until about two weeks after planting some flowers when she had the onset of back and left leg pain again."  (AR 294.)  On July 5, 1995, she was "much improved" and had "returned to her baseline."  (AR 293.)  She reported Relafen had been "quite helpful."  (AR 293.)  Dr. Lanford recommended she stay on the Relafen for a total of three months and indicated he would see her back on a symptomatic basis.  (AR 293.) Plaintiff did not go back to see Dr. Lanford for back pain until 1999.

### 3.    1996

In 1996 Plaintiff underwent surgery to remove her gallbladder (February 1996, *see* AR 331–32); she was diagnosed with hypothyroidism (March, *see* AR 314).  She suffered a couple of bouts of diarrhea and nausea/vomiting and was treated a couple of times for sore throat and congestion.  Her migraine medication was changed in May or June.  (AR 312–13.)

Otherwise, not until December 5, 1996 did Dr. Barnett note that she was again experiencing low back pain with radiation to the right leg, and chronic migraine headaches with poor sleep, usually helped with Fiorinal.  (AR 312.)  The record does not indicate that Dr. Barnett prescribed any pain medication, but on December 30, 1996, Plaintiff continued to complain about low back pain radiating down the left leg, and noted that the pain medication Ultram was not helping.  Dr. Barnett prescribed Percocet instead, and Plaintiff reported by telephone the next day that she was doing better with the Percocet.  (AR 311.)

### 4.    1997

The record indicates Plaintiff called in for medication refills or adjustments periodically but did not come back for a full examination with Dr. Barnett until August 1997.  In August 1997, Plaintiff reported that her low back was "hurt[ing] a great deal" with radiation to the left leg and no obvious precipitating

event.  (AR 310.)  She was experiencing frequent headaches and was also "quite depressed" because of her home situation, in particular that her husband was quite ill with multiple medical problems.  On examination, she had marked limitation in the range of motion of her lumbar spine and a positive straight-leg raise test bilaterally.  She was prescribed St. John's Wort as well as four days' worth of Daypro, a non-steroidal anti-inflammatory drug.  Dr. Barnett recommended treating her back pain with alternating ice and heat.  Her other medications included Elavil, Ambien, Inderal, Synthroid, Prilosec.  A few weeks later, Plaintiff reported that St. John's Wort was not working, and Dr. Barnett prescribed Paxil instead. (AR 310.)

In September Plaintiff added anxiety and panic attacks to her complaints; she also reported that she had "a lot of worries" and was not sleeping well.  Her weight was up somewhat and her blood pressure was "labile."  (AR 309.)  Dr. Barnett refilled Plaintiff's prescriptions for Elavil, Inderal, Synthroid, Prilosec, Daypro, Paxil and Fiorinal.

### 5.    1998

Plaintiff began treatment with a new physician, Dr. Anthony W. Williams, on January 20, 1998. On that date, Dr. Williams listed Plaintiff's medical history as including chronic back pain, migraine headaches, gastrointestinal reflux disease, and hypothyroidism.  He also noted that Plaintiff had a history of depression and "sleeping problems," for both of which she took Elavil.  (AR 390.)  He also noted she did not have complaints of anxiety, fatigue or moodiness.    Plaintiff reported that had been treated for migraines for "several years" and that she was experiencing migraine headaches approximately once every six weeks at that time.  (AR 390.)  Dr. Williams associated her depression with her chronic back pain.  (AR 392.)  He refilled all her medications.  She apparently called in with problems or for medication refills periodically over the next several months.  In April 1998, Dr. Williams appears to have prescribed Naprosyn (an NSAID) and Skelaxin (muscle relaxant), suggesting Plaintiff's back pain might have begun to flare up at that point.  (AR 392.)

In mid-June 1998, Plaintiff reported that she had begun having more frequent migraine headaches, approximately every two weeks.  She reported that Imitrex and Fiorinal together gave good relief, but she felt that the increased frequency of the headaches was related to the decreased quality of her sleep. Elavil/amitriptyline was not as effective as it had been.  Dr. Williams increased her dosage of

Inderal and Elavil in attempt to help prevent the migraines and help her sleep better. (AR 386.) A month later she reported she had tolerated well the medication dosage changes but the headaches were still occurring about every two weeks, so Dr. Williams also increased her Imitrex dosage. (AR 384–85.) In August 1998, Dr. Williams noted Plaintiff's headaches were "currently very well controlled." (AR 383.) In November 1998, she again reported her headaches were occurring "less and less frequently." (AR 382.)

She also noted that her back pain sometimes radiated down her left leg, but "this comes and goes and only bothers her only sparingly." (AR 382.) She was concerned about her weight, which had increased to 271 pounds. Dr. Williams continued her on all current medications, continued conservative therapy for back pain (i.e., none), and recommended that she return in four months to schedule a colonoscopy. (AR 382.)

In December Dr. Williams noted Plaintiff had had to discontinue Elavil because of extreme mouth dryness and, since she was not sleeping as well as she did with Elavil, she began having migraines again. He started her on Depakote. (AR 381.)

### 6. 1999

Plaintiff's condition apparently began to decline somewhat in 1999. Dr. Williams' treatment note for an appointment in January 1999 indicates that Plaintiff reported a lot of emotional stress that was likely causing increased sleeping problems and increased frequency of headaches. She had also been experiencing alternating constipation and diarrhea for a period of a couple of weeks. Dr. Williams increased her Depakote dosage and scheduled a colonoscopy. (AR 380.) Plaintiff continued to complain of frequent migraines in February (AR 376), so Depakote was increased again, which apparently helped. (AR 375.)

In April 1999, her migraines were doing better with the increased dose of Depakote but she was still complaining of diarrhea. (AR 375.) At an appointment later the same month, she reported that her back pain had been progressively worsening over the past three to four months. Physical exam indicated was positive for muscle spasms, and Dr. Williams recommended back exercises. (AR 374.) An x-ray performed at that time was read as indicating mild degenerative joint disease in her lumbar spine. (AR 405.) On May 28, 1999, she reported low back pain on the left side radiating to her left foot and stated Celebrex had provided no relief. Dr. Williams ordered a new MRI. (AR 373.) That MRI, performed in

June 1999, continued to show mild to moderate disc protrusion at L5-S1 without definite nerve root impingement. (AR 402–03.) Plaintiff was referred to Dr. Daniel McHugh at Premier Orthopaedics & Sports Medicine.

At his first examination of Plaintiff on June 14, 1999, Dr. McHugh noted a fifteen-year history of back pain with a progressive increase over the past few months. Dr. McHugh's impression was chronic low back pain with a mild disc bulge at L5-S1. His ordered a short course of physical therapy, a Medrol Dosepak, and Celexa. (AR 421.)

In July, Plaintiff reported to Dr. McHugh that physical therapy had not been helpful. She also stated she had experienced one episode of numbness in her left leg that lasted twenty to thirty minutes and some intermittent "burning" in her feet upon sitting for prolonged periods. She also began complaining of neck pain around this time. Her physician's impression was chronic low back pain "with radiologic evidence suggestive of idiopathic skeletal hyperostosis," and cervical pain possibly related to the same. The recommendation was that she continue home exercises and start taking Flexeril. (AR 422.)

At an appointment with Dr. Williams around the same time she also reported that her migraines were better, coming approximately once every six weeks though she was still not sleeping well. (AR 372.)

Plaintiff began treatment again with Dr. Lanford in August 1999, who ordered an MRI of Plaintiff's cervical spine. According to Dr. Lanford, the MRI showed some straightening of the normal cervical curve, minimal C3-4 and C6-8 bulges, minimal C3-4 positional cord impingement, and "minimal" degenerative disc disease at C6-C7, with mild anterior disc bulge and end plate osteophyte, minimal bulging of posterior annulus but no focal disc bulge or herniation and no cord impingement. (AR 301.) On physical examination, Plaintiff had negative straight leg raise testing and "stable" motor, sensory and reflex exams, but positive foramen closure testing and diminished range of motion in the cervical and lumbar spine areas. He also noted that the prior lumbar MRI showed degenerative disc disease with mild protrusion at L5-S1. (AR 293.)

At a follow-up appointment with Dr. Williams on October 11, 1999, Plaintiff reported she had not experienced relief from two epidural injections and was trying to decide whether to have a third. She

claimed to be having pain in her back at that point most days, with numbness and tingling down her foot. Dr. Williams observed that the MRI "really shows nothing that we can specifically treat with surgical intervention." (AR 371.) Plaintiff also reported having headaches every couple of days at that time, which Dr. Williams believed where "chronic daily headaches related to possibly analgesic use and among other things." Plaintiff also appeared very depressed at that examination. She cried a lot and reported that she had been crying frequently for the past few months. (AR 371.)

A few weeks later she reported improvement of her pain level with the epidural steroid injection but continued to to complain of back and radicular right leg pain and numbness into the left foot. She was scheduled to undergo a lumbar myelogram and post myelogram CT scan, which showed degenerative disc and end plate change at L5-S1 and a mild bulge at L4-5. (AR 447–48.) Dr. Lanford advised her on November 11, 1999 about the mild disc bulge but he also noted "this does not explain all her symptomology." (AR 292.) A follow-up EMG of both legs was normal. (AR 296.) In December, Dr. Lanford recommended nerve root blocks. (AR 290.)

Although Plaintiff's general practitioners had treated her periodically for depression over a number of years, not until November 1999 was she referred to a psychiatrist. At that time, through referral by Dr. Williams, she began seeing psychiatrist Dr. Michael Hill. She continued to have appointments with Dr. Hill approximately every two months over the course of the next year. (AR 481–89.) In November 1999, Dr. Hill noted that Plaintiff was somewhat tearful but that her mood was fair, cognition intact, sensorium clear, and insight and judgment reasonable. (AR 490.) He diagnosed her as having a history of chronic dysthymia with a superimposed Major Depressive Episode, estimated her GAF at 50, and prescribed Wellbutrin and Trazodone. (AR 490.) A month later she reported that she was doing better, sleeping better, though she still cried easily and was still having "life & family problems." (AR 488.) Dr. Hill increased her dosage of both Wellbutrin and Trazodone.

### 7.      2000

With respect to her mental health in 2000, Plaintiff reported to Dr. Hill in January 24, 2000 that the antidepressants "were working" but she was still having some difficulty with sleep. Dr. Hill added Doxepin to her prescriptions and noted she was "improved overall." (AR 487.) His note for March 1, 2000 is

essentially identical (AR 486). In early May 2000, Plaintiff indicated her "depression persist[ed]." (AR 485.) In addition, she was not tolerating the Doxepin, so Dr. Hill added Celexa to the Wellbutrin/Trazodone combination instead. (AR 485.) Two weeks later, Dr. Hill noted that she was "Much improved!" and that the addition of Celexa had "helped notably." (AR 484.) In July 2000, she reported experiencing dry mouth and some anxiety. Dr. Hill noted that some breakthrough depression symptoms still persisted, but overall Plaintiff felt better. (AR 483.) In September 2000, Dr. Hill noted that Plaintiff was in "disability review now (forced to by work)." (AR 482.) On November 6, 2000, he noted she had been "denied disability again" and that this resulted in a "decline in functioning." She was "tearful" and "nihilistic." (AR 481.) He increased her Celexa dosage but otherwise indicated no changes in her regimen.

With respect to her physical health in 2000, Plaintiff continued to experience intermittent problems with back pain and migraine headaches. Dr. Lanford's note from January 24, 2000 (AR 290) indicates that Plaintiff was doing much better since having a nerve root block on January 7, at which time she also received a Medrol Dosepak (AR 439). At the same appointment in late January, she told Dr. Lanford that she "would not like to pursue operative intervention, as she is improving." He prescribed Vioxx and asked her to return in four weeks. (AR 290.) On February 21, 2000, Plaintiff still had some pain (which she described as 90% lumbar and 10% radicular), but she was still doing better after the nerve root block. (AR 288.)

She did not return to Dr. Lanford until May 2000, at which time she continued to report that the nerve block in January had diminished her pain level "considerably" though she still experienced some lumbar pain, left leg pain and burning radiation into the foot, aggravated by sitting. She also indicated Vioxx was helpful. Examination revealed diminished range of motion on flexion and extension in her back but no other positive signs. (AR 289.)

She also returned to Dr. Williams in May 2000 reporting persistent nausea, dyspepsia and mild epigastric pain (AR 245. 369). He sent her for an esophagogastroduodenoscopy with biopsy, which resulted in a diagnosis of esophagitis and gastritis, only partly responsive to Prilosec. (AR 245.) She told Dr. Williams she was seeing Dr. Lanford again for back pain and that the nerve block had been effective. (AR 369.)

In July 2000, Dr. Lanford refilled her Vioxx prescription, noted that she was scheduled for a follow-up nerve block (which apparently was performed on August 18, 2000 (AR 425)), and requested that she return in three months.  (AR 287.)

She returned to see Dr. Williams in August 2000, who noted that she continued to have low back pain; she also reported "emotional problems."   (AR 366.)  On November 7, 2000, she reported to Dr. Williams that she was having headaches every three to four days at that point.  She also noted the nerve block injections she had received had helped her back pain.  (AR 365.)

In December 2000, just after the disability onset date, Dr. Lanford noted that Plaintiff had had a lumbar epidural steroid injection with good improvement, though she continued to have baseline pain.  He added a "magnetic corset" to her regimen and instructed her to return to see him symptomatically.  (AR 595.)

C.    **Mental Residual Functional Capacity Assessments**

The record includes an independent Mental Status Examination report from Alan Yarbrough, Ed.D,  who performed clinical interview and mental status exam on September 22, 2000.  Dr. Yarbrough noted that Plaintiff was currently taking Wellbutrin, Trazodone, and Lorazepam (the latter of which is not in Dr. Hill's prescription list).  Plaintiff was mildly tearful during the exam and reported that she no longer participated in things like church activities, and that she had difficulty sleeping and concentrating.  She reported her activities of daily living as including light household chores (cleaning kitchen, dusting furniture, driving, grocery shopping) with frequent breaks.  Dr. Yarbrough assessed Plaintiff has having a major depressive episode in partial remission and assigned her a current GAF of 50.  He estimated her highest GAF in the past year to be 50.  (AR 491–94.)

Consulting psychologist Frank Edward, Ph.D., completed a Psychiatric Review Technique form for Plaintiff on September 28, 2000, in which he assessed her medical impairments as "not severe," but indicated that she did have a depressive disorder, NOS.  (AR 503, 506.)  He also assessed her has having mild limitations in the areas of performing activities of daily living, maintaining social functioning, and maintaining concentration, persistence and pace, and no episodes of decompensation.  (AR 513.)

Treating psychiatrist Dr. Michael Hill completed a Mental Capacities Evaluation on November 13, 2000, immediately prior to Plaintiff's 50th birthday and her disability onset date.  (AR 477–78.)  Dr. Hill

noted that, as of that date, Plaintiff had moderate to marked limitation in her ability to follow work rules; deal with the public; maintain attention, concentration and pace; and deal with work stresses; moderate limitations in her ability to respond appropriately to supervisors and co-workers, behave in emotionally stable manner, and relate predictably in social situations; and no or slight limitation in her ability to deal with changes in work setting, understand, remember and carry out simple job instructions, and demonstrate reliability.  In the narrative section of the report, Dr. Hill stated:  "as of today, [patient] has moderate to marked impairment overall regarding any occupation – her prognosis, however, is excellent & wellness should be achievable soon."  (AR 477.)  He also noted that the "recent denial of disability claim has caused setback in functioning."  (AR 478.)[2]

Agency consultant Dr. William Regan completed a Mental Residual Functional Capacity Assessment on January 12, 2001 apparently based entirely upon Dr. Hill's and Dr. Yarbrough's assessments.  Dr. Regan assess Plaintiff at that time has having a marked limitation in her ability to understanding and remember detailed instructions, ability to carry out detailed instructions and interact appropriately with general public; moderate limitations in responding appropriately to changes in work setting, the ability to complete normal work weeks without interruption from psychiatric symptoms, and ability to maintain concentration.  He also found Plaintiff to be mildly limited in performing activities of daily living and social functioning, and moderate limitation in maintaining concentration persistence pace.  (AR 517–18.)  The narrative section of the report simply reiterates his findings.  Dr. Regan noted that Plaintiff was "unable to perform detailed tasks" but had "no problem [with] simple tasks," and was "unable to relate to the public" but had "no problems [with] supervisors & coworkers.  (AR 519.)  (The final line of this narrative is illegible.)

### D.    Physical Residual Functional Capacity Assessments

Agency consulting Dr. Lawrence Schull filled out a Physical Residual Functional Capacity form on September 25, 2000 in which he opined that Plaintiff could occasionally lift fifty pounds and frequently lift

---

[2]  Dr. Hill's expectation that Plaintiff's condition would improve seems borne out by his assessment completed in July 2003 in which he found Plaintiff to have "moderate" limitations in a few areas such as understanding, remembering and carrying out detailed instructions and interacting with supervisors, but only a "slight" limitation in dealing appropriately with the public.  (AR 722–23.)  On the more recent form, a finding of a "slight limitation" is defined as indicating the claimant has "some mild limitations in this area, but the individual can generally function well."  (AR 722.)  "Moderate" means the individual has "some moderate limitation" but "is still able to function satisfactorily."  (AR 722.)

twenty-five pounds, could stand and/or walk for about six hours and sit for six hours in any eight-hour workday, had an unlimited ability to push, pull, etc., but should limit stooping to "occasionally." (AR 496–97.) Dr. Schull's explanation of how the record evidence supported his findings is completely illegible.

Treating physician Dr. Anthony Williams performed a Physical Capacities Evaluation on November 13, 2000. He assessed Plaintiff as being able to sit for three hours, stand four hours and walk three hours in an eight-hour workday, both "at one time before requiring an alternate position" and combined, but also indicated she would need to lie down for one hour during the day. (AR 363.) He answered "no" to the question of whether she would need frequent restroom breaks and indicated she could frequently lift 0-9 lbs, occasionally lift 10-19 pounds, rarely lift 20-49 pounds, and never lift 50-100 pounds. He believed she should limit stooping to thirty minutes per day and completely avoid unprotected heights, but he assigned no limitations in the areas of reaching, handling, fingering and feeling. (AR 363–64.) Under "Diagnosis, findings, test results that support this evaluation," Dr. Williams referenced only "Low Back pain – mechanical – " and "MRI central disco protrusion / herniation, Grade I retrolisthiasis L5-S1."

A Physical Residual Functional Capacity assessment filled out by agency consultant Dr. Denise Bell on January 19, 2001 suggests Plaintiff could frequently lift twenty-five pounds and occasionally lift fifty, could stand and or walk six hours and sit six hours in an eight-hour workday, and was unlimited in her ability to push and pull. (AR 535–42.) In the explanation section, Dr. Bell referenced her finding that the record never reflects that Plaintiff experienced greater limitations than those found by Dr. Bell for any twelve consecutive months dating from November 1994 through December 2000. (AR 537.)

### E. Plaintiff's Employment Disability Pension from Her Employer

No longer able to drive a school bus, Plaintiff applied for a disability pension with the Metropolitan Employee Benefit Board ("MEBB"), which was approved in June 1995. The letter documenting approval indicated that Plaintiff's pension was subject to annual medical review. (AR 624–25.) The finding of disability was based predominantly upon findings made by Dr. Jack Corban, Civil Service Medical Examiner, reflected in a letter dated March 29, 1995, that Plaintiff was "incapable of the safe operation of a school bus" due to degenerative disc disease with disc herniation at L5-S1 with nerve root compression, with poor prognosis for further improvement. (AR 626.) The finding was also supported by a letter

submitted by Dr. Lanford in January 1995, in response to a request from the MEBB, indicating he restricted her to lifting no more than ten pounds frequently twenty pounds occasionally, to sitting no more than two hours at a time, and to avoid driving a bus altogether.  (AR 599–600.)

In his response to letter from the MEBB dated February 29, 1996 for updated information about Plaintiff's medical status, Dr. Lanford indicated he had only seen Plaintiff on "a couple of occasions" over the course of the previous twelve months and that he was "not sure of her status at this point but [did] not feel that this would have changed significantly."  (AR 597.)  He also provided copies of his treatment notes.  In response to a similar letter, Dr. Barnett reported that because Plaintiff's low back problem was "chronic and not correctable to enable her to remain relatively free of pain, she should avoid lifting more than 10 pounds on a tentative basis and no more than 20 pounds occasionally.  She should avoid prolonged sitting, such as longer than 1 hour at a time, and also prolonged standing.  Movement, such as getting in and out of a car, should be made very cautiously.  Bending should be avoided whenever possible. . . ."  (AR 589.)  Dr. Barnett further indicated his opinion that driving a bus "would prove problematic to her chronic back condition, but he added:  "I am sure there may be other forms of employment that her chronic low back disorder would enable her to fulfill gainfully."  (AR 590.)  Based on his review of the letters from Drs. Lanford and Barnett, Dr. Corban advised the MEBB on March 14, 1996 that his opinion from March 1995 was unchanged and he "seriously doubt[ed] that Mrs. Jones could perform full-time work, even of a sedentary nature."  (AR 594.)  In a letter dated July 8, 1996, the MEBB notified Plaintiff that her disability pension would be continued "without stipulated reexamination," meaning she would not be reexamined on a regular basis but would be "subject to reexamination at the discretion of the Board or at least on five (5) year intervals."  (AR 627–28.)

**F.      Plaintiff's Testimony at the December 3, 2003 Hearing**

At the hearing Plaintiff indicated she experienced migraines while working as a school-bus driver and they occasionally caused her to have to pull over for a period of time but did not cause her to have to stop working.  (AR 65.)  She testified that from 1994 through 2000, the rate at which she experienced migraines varied from once or twice a week to once every six weeks, depending on what was going on in her life.  (AR 65–66.)  She dealt with the migraines by taking medication and lying down in a dark place for a day or two, or sometimes for just an hour.  (AR 66.)  But "the medicine that they have come up with

for migraines [in the past five years] has been a big help. . . . They've made good progress with that." (AR 66.) She also stated she experienced insomnia frequently, which was the most common trigger of migraines for her. (AR 66–67.)

Plaintiff testified that for the time period from 1994 through 2000, her back pain was "just absolutely terrible" and that nothing the doctors tried helped much. (AR 65.) She stated that during that time period, in terms of her activities of daily living, she frequently could only do "small things" around the house for fifteen minutes at a time. (AR 70.) If she stood or walked for more than 15 minutes, she would start hurting. (AR 70.) In response to questions by the ALJ, Plaintiff indicated she drove occasionally to the store and back.

When asked about her depression, Plaintiff acknowledged she began seeing a psychiatrist in 1999 but asserted that she was depressed even when she was working as a school-bus driver. Other than working, all she wanted to do was sleep. (AR 71.) She claimed she did better when she stopped driving the bus but "was still depressed because of the pain," and cried frequently, at least once a day. (AR 71.) During the relevant time period (1994 to 2000) she interacted with other people at church and also saw her children and grandchildren. The Paxil prescribed by Dr. Barnett was not effective.

With respect to her gastrointestinal and reflux problems, Plaintiff indicated that after changing medications several times, her physicians finally "got that under control" around 1999. (AR 67.) She also testified she had had irritable bowel syndrome "for years" which was "tough" to live with, but it was something she learned to live with and she managed to continue driving a bus when she had the problem. (AR 68.)

### III.    THE ALJ'S DECEMBER 6, 2004 DECISION

Based on his review of the entire record, ALJ Mack Cherry made the following findings in the written opinion issued on December 6, 2004:

1.    The claimant met the insured status requirements of title II of the Social Security Act as of November 1, 1994, and continued to meet them through November 17, 2000.

2.    The claimant did not engage in any substantial gainful activity during the relevant time period of November 1, 1994, through November 17, 2000.

3.    The evidence establishes that the claimant had a severe combination of impairments, including degenerative disc disease and depression, but that she did not have any impairment of combination of impairments of the level of

severity required by 20 CFR Part 404, Subpart P, Appendix 1.

4.  The evidence establishes that the claimant did not experience any pain or other symptomatology of a disabling level of severity on an ongoing basis.

5.  The claimant retained the capacity to perform a wide range of light work, with the limitations outlined in the body of the decision [namely, that plaintiff "retained the capacity to perform light work with lifting of up to 20 pounds occasionally and 10 pounds frequently, could walk/stand 6 or more hours during an 8-hour workday, needed to alternate between a sitting and a standing position, should have avoided activities such as climbing, crouching, crawling . . . , and had moderate limitations in performing detailed job instructions, interacting with other people, and adapting to changes in a routine work setting." (AR 24.)].

6.  The claimant was unable to perform her vocationally relevant past work.

7.  The claimant was a younger individual until November 18, 1995, when she attained age 50, remaining a person closely approaching advanced age thereafter through the remainder of the relevant time period.

8.  The claimant has a limited education.

9.  The claimant performed semiskilled work during her vocationally relevant past, but her job skills were not transferrable to other work.

10. Base on an exertional capacity for light work, and the claimant's age, education, and work experience, section 404.1569 and Rules 202.11 and 202.18, Table No. 2, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion that the claimant was "not disabled" during the relevant time period.

11. Although the claimant's limitations prevented her from being able to perform the full range of light work, using the above-cited rules as a framework for decisionmaking, there were a significant number of jobs in the national economy which she could have been expected to perform. Examples of such jobs are: mail clerk, security guard, teacher's aide, general office clerk, and sales counter clerk. From the vocational expert's testimony, there were over 23,500 of the named samples of jobs in existence in the local economy, with over 1, 400,000 of such jobs in existence in the national economy: a significant number of jobs.

12. The claimant was not under a "disability" as defined in the Social Security Act, during the relevant time period of November 1, 1994, through November 17, 2000. 20 CFR 404. 1520(g).

(AR 25–26.)

## IV.   STANDARD OF REVIEW

### A.   Standard of Review

Under the Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. The Act provides that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). This Court, therefore, is limited to determining whether substantial evidence supports the Commissioner's findings and whether

the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990). If substantial evidence supports the ALJ's conclusion and the ALJ applied the correct legal standards, this Court cannot reverse the ALJ's decision even if substantial evidence exists in the record that would have supported an opposite conclusion. *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995). Conversely, however, the Court must reverse and remand for further findings if the ALJ applied incorrect legal standards, even if the factual determinations are otherwise supported by substantial evidence and the outcome on remand is unlikely to be different. *See, e.g.*, *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545, 546 (6th Cir. 2004). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantiality is based on the record taken as a whole. *See Houston v. Sec'y of Health and Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

When there has been a misapplication of the regulations or when there is not substantial evidence to support one of the ALJ's factual findings, the appropriate remedy is generally remand under sentence four of 42 U.S.C. § 405(g) for further consideration. *See Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994).

**B.      Evaluation Of Entitlement To Social Security Benefits**

Under the Social Security Act (the "Act"), a claimant is entitled to receive benefits only if he is deemed "disabled." 42 U.S.C. § 423(d)(1)(A). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

In applying the standards for determining disability, the Secretary has promulgated regulations setting forth a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520 and 406.920. An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. See id. The Sixth Circuit has summarized the steps as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity and is suffering from a severe

impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); 20 C.F.R. § 404.1520(b)-(f). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at step five to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and residual functional capacity. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V. ANALYSIS AND DISCUSSION

In the "Argument" section of her brief, beginning at page 72 of the 84-page document, Plaintiff makes seven discrete arguments in support of her Motion for Judgment on the Administrative Record: (1) the ALJ's attack on Plaintiff's credibility is contrary to the evidence; (2) the ALJ failed to properly consider and evaluation the record as a whole and all of Plaintiff's medical impairments in combination; (3) in violation of 20 C.F.R. §§ 404.1545 and 416.929, the ALJ did not appropriately evaluate Plaintiff's subjective complaints of pain; (4) the ALJ did not give sufficient weight to Plaintiff's treating sources nor give good reasons for the amount of weight given; (5) the ALJ's finding that Plaintiff's obesity, irritable bowel syndrome, and insomnia were not, singly or in combination, severe impairments, is not supported by substantial evidence and his failure to consider Plaintiff's obesity at all violated SSR 00-3p; (6) the ALJ erred in failing to find Plaintiff disabled pursuant to Grid Rule 201.10 as of her 50th birthday on November 18, 1995; and (7) the VE's testimony did not satisfy SSA policies and definitions and as such does not qualify as "substantial evidence" and should be rejected.[3]

Although the Commissioner did not do so, thereby providing the Court limited assistance in ruling on the plaintiff's motion, the Court will consider each of these enumerated arguments in turn, except that the first and third arguments, which are overlapping, will be considered together.

---

[3] Plaintiff also spends fifteen pages in a "Review of the ALJ's Rationale," in which she attacks specific statements made by the ALJ as unable to "withstand scrutiny." (Doc. No. 30, at 57.) Presumably, Plaintiff intends to assert that the ALJ's various findings, as well as his overall decision, is not supported by substantial evidence in the record.

**A.** **Whether the ALJ Properly Evaluated Plaintiff's Level of Pain or Inappropriately Discounted Her Credibility Regarding Her Subjective Complaints**

SSR 96-7p provides instruction on evaluating credibility as follows:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements. In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true. When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

In addition, 20 C.F.R. § 404.1529(c) describes the kinds of evidence that the ALJ is to consider, in addition to the objective medical evidence, when assessing the credibility of an individual's statements, including:

> 1) Your daily activities;
>
> 2) The location, duration, frequency, and intensity of your pain or other symptoms;
>
> 3) Precipitating and aggravating factors;
>
> 4) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
> 5) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
>
> 6) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
>
> 7) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

In his written decision, consistent with both SSR 96-7p and the above-listed factors from 20 C.F.R. § 404.1529(c), the ALJ determined that Plaintiff's complaints of debilitating back pain and headache pain from migraines were somewhat exaggerated and that her allegation that she could not sustain regular and continuous work from November 1994 through November 2000 was inconsistent with the objective medical evidence, the type of medications and other treatment prescribed, the failure to take any other measures to relieve pain, and Plaintiff's range of daily activities.

Specifically, in the paragraph addressing Plaintiff's pain and her credibility, the ALJ stated as follows:

> Using the criteria outlined in Social Security Regulation 404.1528 and Social Security Ruling 96-7p, I find that the claimant did not experience any pain or other

symptomatology of a disabling level of severity prior to November 18, 2000. Diagnostic tests only showed evidence of a mildly bulging disc and early spondylolisthesis but no nerve root compression. She displayed some decreased range of motion of the back, but had normal motor strength, reflexes and sensation upon examination. She indicated that her discomfort occurred intermittently, and responded to treating with occasional nerve blocks and epidural steroid injections, along with oral medications such as Percocet. Other conservative measures such as back exercises and posture training were used to ameliorate her complaints, also. She did not follow prescribed medical advice to lose weight to reduce her back complaints. Her back discomfort was not severe enough to prompt her to undergo back surgery. She did not visit physicians complaining of severe side-effects from treatment. With regard to her headaches, she had been able to work for years despite the condition. She indicated that treatment with medications such as Fiorinal relieved the headaches. The treatment notes fail to document that she experienced headaches of a disabling level of frequency or severity. . . . Physicians indicated that she should not continue driving a bus with her back complaints, due to the jarring involved, but indicated that she could be expected to perform other types of work. At home, she received some help from her husband with household chores, but did cook, do dishes, dust, pick up and straighten up around the house, and do laundry. . . . She attended church, visited with relatives, tended flowers, went to bible study, cared for her dog, went shopping, quilted, sewed, watched television. Her applications for disability benefits were linked to the requirement by Metro government for individuals receiving a disability pension to file for Social Security disability benefits. . . . The claimant is less than fully credible as a witness with regard to her allegations of disability, with the evidence indicating that her complaints are exaggerated in nature. Physicians who evaluated the claimant after November 18, 2000, the onset date of disability previously granted, have noted that her subjective complaints of pain appear to be atypical with regard to the alleged locations described by the claimant. (i.e., Exhibits B37F and B40 F). Likewise, in 2003, Dr. Knapp noted that she has exaggerated complaints with symptom magnification. Exhibit B37F. He noted that her complaints of hand stiffness were from her continued "heavy duty quilting." Exhibit B37F, page 4.

(AR 22–23.)

A claimant's credibility is a significant consideration in the evaluation of pain, because tolerance of pain is very much an individual matter. *Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). An ALJ may distrust a claimant's allegations of disabling symptomatology if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other, *Moon v. Sullivan*, 923 F.2d 1175, 1183 (6th Cir. 1990). Thus, discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 532 (6th Cir. 1997). Plaintiff obviously disagrees with the ALJ's discounting of her credibility, but from the passage quoted above it is nonetheless clear that the ALJ stated sufficient reasons for his credibility determination with regard to Plaintiff's degree of pain. Accordingly, the Court declines to disturb the ALJ's credibility findings.

**B.** **Whether the ALJ Complied with his Obligation to Examine the Evidence in the Record "Taken as a Whole" in Evaluating and Considering All of Plaintiff's Impairments**

Plaintiff attacks particular statements made by the ALJ, none of which, the Court notes, is supported by a citation to the Administrative Record. Regardless, most of the "comments" to the ALJ's statements amount to little more than semantic quibbles. At best they amount to a disagreement as to the inference to be drawn from the evidence of record. They do not actually demonstrate that the ALJ failed to consider the record as a whole. Plaintiff argues that the ALJ did not "meaningfully take into account the evidence in [Plaintiff's] favor, but to the contrary focused exclusively on anything that could possibly be characterized as supporting a denial of benefits," and then asserts baldly that "[t]his constitutes reversible error." (Doc. No. 30, at 73.)

Obviously, the ALJ's consideration of the record takes up far less paper than the Plaintiff's forty-two page "summary" of Plaintiff's medical history, but that fact alone does not mean that the ALJ failed to consider the record as a whole. He addressed her history of low back pain and the treatment thereof, her mild hypothyroidism, removal of her gallbladder, her treatment for migraine headaches, depression, insomnia, gastric reflux disease and irritable bowel syndrome. The ALJ's opinion does not suggest that he failed to consider the record as a whole in considering Plaintiff's claims or that he failed to take into account Plaintiff's "non-severe" problems in combination with those problems considered severe.

**C.**  **Whether the ALJ Gave Appropriate Weight to the Opinions of Treating and Consulting Sources and Gave Good Reasons for the Weight Given these Opinions**

The Sixth Circuit has observed that even where the Commissioner's decision to reject a claimant's disability application is otherwise supported by substantial evidence, reversal will nonetheless be required if the agency fails to follow its own procedural regulation requiring the agency to " 'give good reasons' for not giving weight to a treating physician in the context of a disability determination." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)).

The regulations explain that an ALJ generally is required give more weight to opinions from treating sources since "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2). Further, an ALJ must give the opinion of a treating source controlling weight if he finds

the opinion to be "well supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." *Id.* If the opinion of a treating source is not accorded controlling weight, an ALJ must consider such factors as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion. *Id.*

The regulation also clearly requires the agency always to "give good reasons" in the ALJ's decision for the weight given the treating source's opinion." *Id.* "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *Wilson*, 378 F.3d at 544–45 (citing *Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

In addition, however, the Commissioner has interpreted its own rules in 20 C.F.R. §§ 404.1527(f) and 416.927(f) as requiring ALJs to consider the opinions of agency consultants "as opinions of nonexamining physicians and psychologists." SSR 96-6p. Specifically, ALJs are not "bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions." *Id.*

In the present case, Plaintiff argues that the ALJ, in denying Plaintiff's claim, improperly rejected the opinions of her treating primary care physician, Dr. Barnett (who stated Plaintiff would need to lie down one hour out of an eight-hour workday); treating psychiatrist Dr. Hill (who assigned Plaintiff a GAF level of 50); consulting and examining psychologist Dr. Yarbrough (who also assigned a GAF of 50 and noted that Plaintiff's ability to interact with the general public was impaired); and non-examining DDS consultant Dr. Regan (who assigned Plaintiff "marked" limitations in her ability to deal with the general public). Plaintiff insists that the ALJ, besides failing to give appropriate weight to these opinions, did not give "good reason" for rejecting any of them.

The defendant does not actually address this point, instead arguing simply that the ALJ's decision is supported by substantial evidence in the record—which is irrelevant if the ALJ failed to follow the law correctly in reaching his decision. As explained below, the Court nonetheless finds that the ALJ did not err in his treatment of these medical source opinions.

### (1) The Weight Accorded Dr. Barnett's and Dr. Lanford's Opinions

Both Dr. Barnett's and Dr. Lanford's opinions about Plaintiff's work abilities were given in early 1995 and again in early 1996 (in Dr. Lanford's case) in the context of Plaintiff's application for a disability pension from her employer. Dr. Lanford responded to an inquiry from the MEBB about Plaintiff's status in January 1995 and again on February 29, 1996. His January 1995 letter stated that Plaintiff had "made some improvement with epidural steroid injections"; she was "having less pain"; and she was not working "secondary to the jarring of driving a bus." (AR 598.) He noted that he had released her to return to work at that time but was limited to lifting not more than twenty pounds and sitting no longer than two hours at a time, and she should avoid driving a bus (*Id.*) In response to a request for updated information in February 1996, Dr. Lanford noted that he had provided a similar letter in January 1995 and that he had only seen Plaintiff "on a couple of occasions since then" but had no reason to believe her restrictions had changed substantially. (AR 597.) Similarly, on March 1, 1996, Dr. Barnett dictated a "To Whom It May Concern" letter in which he stated that Plaintiff's low back pain was "chronic and not correctable to enable her to remain relatively free of pain." (AR 589.) For that reason he believed she should live not more than ten pounds "on a tentative basis," and twenty pounds occasionally; she should avoid sitting for more than one hour at a time and avoid prolonged sitting. (AR 589.) He opined that continuing to drive a school bus would "prove problematic to her chronic back condition," but that he was "sure there may be other forms of employment that her chronic low back disorder would enable her to fulfill gainfully." (AR 589–90.)

In other words, the opinions were not markedly different. In his decision, the ALJ specifically stated that he accorded greater weight to the opinion of Dr. Lanford than to that of Dr. Barnett, noting correctly that there was no evidence in the record that Plaintiff had spoken to Dr. Barnett about her back problems with any degree of specificity throughout 1995 and early 1996 and that Dr. Lanford was Plaintiff's treating back specialist. Because Dr. Barnett had not treated Plaintiff for back pain during the

time frame relevant to the particular assessment at issue and because Dr. Lanford was a treating specialist, the ALJ did not err in according Dr. Lanford's opinion greater weight. Moreover, the medical treatment records amply support a finding that Plaintiff's back pain caused her minimal problems in 1995.

### (2) The Weight Accorded to the Opinions of Drs. Hill and Yarbrough

Specifically with regard to her ability to interact with the public, Dr. Yarbrough observed, on the basis of his examination conducted in September 2000, that Plaintiff's "social interaction was appropriate with the exception of being mildly tearful. This would certainly interfere with her ability to interact appropriately with the general public, especially in a stressful work-type situation." (AR 493.) However, he also felt that Plaintiff was "able to adapt appropriately and be aware of normal hazards in the workplace." (*Id.*) He assessed her as having a current GAF of 50.

Plaintiff's treating psychiatrist, Dr. Michael Hill, completed a Mental Capacities Evaluation form on November 13, 2000 in which he noted that, a*s of that day*, Plaintiff had "moderate to marked impairment overall regarding any occupation," but that "[h]er prognosis . . . is excellent & wellness should be achievable soon." (AR 479.)

With respect to the opinions of both Hill and Yarbrough, the ALJ noted as follows:

[Plaintiff] did not visit a psychiatrist complaining of depression until November 1999, when she was under increased stress due to her husband's medical condition. The treatment notes document that her condition responded quickly with treatment. Her medication was changed or adjusted, as needed, such as when she had a setback after disability benefits were denied. She did not require hospitalization for stabilization or mental health treatment.

. . . .

With regard to the "B" criteria in assessing the limitations imposed by her mental condition, I find that she had a mild reduction in her activities of daily living, a moderate limitation in her social function, a moderate limitation in her ability to maintain concentration and attention, and no episodes of decompensation of extended duration. . . She was noted to have moderate to severe symptoms when first evaluated [by Dr. Hill] in November 1999, but her condition improved with treatment. . . . . When evaluated by a psychological examiner [Dr. Yarbrough] in September 2000, her ability to maintain concentration and attention was noted to be fair. With regard to her social function, she was rated as having some limitations with regard to interacting with the general public. She was noted to retain the ability to make adaptations. Her treating psychiatrist noted that she had a temporary setback in her condition in November 2000, having moderate to marked limits in dealing with the public, maintaining her concentration, and coping with stress, but indicated that her prognosis was excellent and that her condition should soon improve.

(AR 23–24.)

In other words, by assessing Plaintiff has having moderate limitations, as noted above, the ALJ essentially adopted Dr. Hill's opinion and assumed, as did Dr. Hill, that Plaintiff was not permanently limited in her ability to deal with the general public, but that she would improve at the very least from "marked" to "moderate" limitations. Because the ALJ essentially adopted Dr. Hill's assessment, he was not required to give good reason for his failure to do so, and he did give good reason for presuming that the "set back" in November 2000 was temporary. Likewise with respect to Dr. Yarbrough's assignment of a GAF score of 50, the ALJ reasonably reached the conclusion, based on Dr. Hill's treatment notes, that Plaintiff's level of functioning had not been at 50 for an entire twelve-month period. As Defendant points out, "to show a small window where Ms. Jones had disabling level pain, or a GAF of 50, is not disabling under the Act. Ms. Jones must, but cannot, establish ongoing impairment that, even when considering treatment and medication, lasted (made her disabled) for a twelve month period." (Doc. No. 40, at 7.)

In sum, the ALJ did not reject Dr. Hill's or Dr. Yarbrough's opinions, but took them for what they were: snapshots of how the Plaintiff was doing at that particular time rather than statements of how she had been for the preceding year or how she would be after another few months. His decision in that regard is amply supported by the medical record.

### (3) Weight Accorded Dr. Regan's Assessment

According to the Mental Residual Functional Capacity Assessment found in the record at pages 517 through 520, Dr. Regan opined on January 12, 2001, shortly after the November 18, 2000 disability onset date, that Plaintiff had a "marked" impairment in her ability to interact appropriately with the general public. Dr. Regan did not provide any support for his findings, however, and the ALJ provided reasons for accepting the opinions of Plaintiff's treating and examining physicians as set forth above (that Plaintiff had suffered a setback in her condition and at that time had a moderate to marked impairment in her ability to deal with the public, but "her prognosis was excellent and that her condition should soon improve" (AR 24)). Under the circumstances, the ALJ was not required to give any weight to Dr. Regan's completely unsupported opinion. *See* SSR 96-6p.

### D. Whether the ALJ Erred in Failing to Find that Plaintiff's Obesity, IBS and Insomnia Were, Singly or in Combination, "Severe Impairments"

A "severe" impairment is one that significantly limits a claimant's ability to do basic work activities. 20 C.F.R. § 416.920(c). SSR 85-29 provides that an "impairment or combination of impairments" may be

considered non-severe "when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." Further, although an impairment that has no more than a minimal effect on an individual's ability to do basic work activities may not be considered severe, the Commissioner generally must consider the possibility that several such minimal impairments, considered together, may produce a severe impairment that must be considered. *Id.*

Plaintiff asserts that the ALJ failed to follow the law at Step 2 because he failed even to mention Plaintiff's obesity, much less consider it. Plaintiff insists that failure to do so was in violation of SSR 00-3p.

The referenced Social Security Ruling, however, simply clarifies how a finding of obesity may factor into a finding of disability, now that obesity *per se* is no longer a listed impairment. The Ruling points out that some changes were made in other listings to ensure that obesity is still addressed in the listings. More specifically, paragraphs were added to the prefaces of the musculoskeletal, respiratory, and cardiovascular body system listings to "provide guidance about the potential effects obesity has in causing or contributing to impairments in those body systems. *Id.* (citing Listings §§ 1.00F, 3.00I, and 4.00F). SSR 00-3p characterizes the added paragraphs as follows:

> The paragraphs state that we consider obesity to be a medically determinable impairment and remind adjudicators to consider its effects when evaluating disability. The provisions also remind adjudicators that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately. They also instruct adjudicators to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity.

*Id.*

None of the referenced listing is at issue here, and the simple fact is that none of Plaintiff's medical practitioners considered Plaintiff's obesity to be disabling. Several of her practitioners recommended that she lose weight in order to reduce the stress on her back, but it is clear that the effect of her weight was taken into consideration both by her treating physicians and by the ALJ in determining whether her back pain was disabling. Otherwise, Plaintiff was not indicated to be short of breath or arthritic or otherwise to be suffering, prior to November 2000 at least, from any work-related impairments resulting from obesity. The ALJ's failure to consider her obesity as an impairment, either singly or in

combination was not an error where neither the medical record nor Plaintiff's own complaints gave him a reason to do so.  It should also be noted that Plaintiff's weight did not appear to fluctuate substantially from the time when she was successfully working as a bus driver and having to lift children and wheelchairs on a regular basis, and subsequent years when she was no longer working.  In other words, her obesity clearly was not disabling while she was working.

Likewise with respect to her IBS and headaches, the ALJ noted that Plaintiff had a "long-term history of migraine headaches, but was able to work with that condition" and, similarly, that she had irritable bowel syndrome while working as a bus driver but had "learned to live with it."  (AR 22.)  The ALJ further observed that Plaintiff's medical treatment notes "failed to document that she experienced headaches of a disabling level of frequency or severity" or that, if she had irritable bowel syndrome, that she had any "related limitations of function."  (AR 23.)  Those findings are supported by the record, including Plaintiff's own testimony at the hearing.

In any event, it is clear that the ALJ considered these problems and assessed the degree to which the record indicated they interfered with Plaintiff's ability to work.  The ALJ's determination that the record did not support a finding that these impairments were "severe," whether considered singly or in combination, is supported by substantial evidence in the record.

> **E.** **Whether the ALJ Erred in Failing to Find Plaintiff Disabled on her 50th Birthday Pursuant to Grid Rule 201.10**

Grid Rule 201.10, to which Plaintiff refers, directs that a person closely approaching advanced age (i.e., ages 50-54), with limited or less education, whose skills are not transferable, and who is limited to sedentary work, is considered disabled.  20 C.F.R. pt. 404, subpt. P, app. 2, Table 1, Rule 201.10.  In other words, Plaintiff here disputes the ALJ's finding that she retained the capacity to work a wide range of light work.  If he had found her capable of sedentary work only, then Grid Rule 201.10 would have directed a determination that Plaintiff was disabled for Social Security purposes as of the date of her fiftieth birthday.  (Grid Rule 202.11 directs that a person capable of performing a *full* range of light work but who otherwise meets the same description (closely approaching advanced age, limited education, no transferable skills) must be considered not disabled.)

Notwithstanding, the ALJ's determination that Plaintiff could perform a wide range of light work during the relevant time frame (from November 1, 1994 through November 18, 2000), including the ability

to lift up to 20 pounds occasionally and 10 pounds frequently, to walk or stand six or more hours in an eight-hour workday, to alternate between sitting and standing positions, is supported by substantial evidence in the record, namely the Plaintiff's own treating physicians' assessments.

### F. Whether the VE's Testimony Constituted "Substantial Evidence"

Plaintiff argues that, according to SSR 00-4p, an ALJ may not rely on evidence provided by a vocational expert "if that evidence is based on underlying assumptions or definitions that are inconsistent with [the agency's] regulatory policies or definitions." More specifically, Plaintiff argues that jobs presented by a VE, at step five of the sequential evaluation, must be comprised only of unskilled work, but that the jobs referenced by the VE in this case included semi-skilled positions (SVP=3) as well as unskilled. Plaintiff asserts that, because there is no way to "redact" the VE's testimony to separate the unskilled from the semi-skilled jobs, the VE's testimony is entitled to no weight.

At the hearing, the ALJ, before he began questioning the VE, Dr. Gordon Doss, first set out a hypothetical situation involving a claimant with 10th grade (limited) education, closely approaching advanced age, and no transferable skills. This hypothetical claimant was limited to light work, meaning she could stand or walk for six hours in an eight-hour workday but needed a sit-stand option; she was limited in the ability to push or pull with the lower extremities; needed to avoid ladders, ropes and scaffolds; could engage in very limited climbing, occasional balancing, stooping, kneeling or bending but no crouching or crawling and no exposure to temperature extremes, dampness, wetness, humidity, vibrations, jolts and jars, hazardous machinery or unprotected heights. (AR 86.) The ALJ also indicated he accepted, for purposes of this hypothetical, exhibit B39-F. Exhibit B39-F is treating psychiatrist Dr. Michael Hill's Medical Source Statement of Ability to do Work-Related Activities (Mental), in which Dr. Hill opined that Plaintiff had moderate limitations in her ability to understand, remember and carry out detailed instructions; to interact appropriately with supervisors; to respond appropriately to work pressures in a usual work setting; and to respond appropriately to changes in a routine work setting; and that she had "slight" limitations in her ability to interact appropriately with the public and with co-workers. (AR 722–23.)[4]

---

[4] This form, dated July 16, 2003, defines "slight" as "some mild limitations in this area, but the individual can generally function well," and indicates that "moderate" means an individual has some "moderate limitation" in the given area "but the individual is still able to function satisfactorily." (AR 722.)

Dr. Doss testified that a claimant with those limitations would not be able to perform the Plaintiff's past work, and that she had no transferable skills. Asked to identify sedentary and light jobs a person with the identified limitations could perform, the VE listed mail clerk (2795 unskilled light level jobs in the state in 1995); security guard, at a place not involving environmental hazards (2400 unskilled light level jobs in the state in 1995); unskilled teacher's aide (1250 jobs in the state in 1995); sedentary teacher, unskilled (2427 jobs in Tennessee); general office clerk (5637 unskilled light jobs in the state, and 5468 unskilled sedentary jobs in the state); sales counter clerk (3635 unskilled light jobs in the state in 1995). (AR 87–88.) He further indicated there would be 60 to 65,000 of these jobs available nationwide. (AR 89.)

Upon questioning by the Plaintiff's counsel, the VE further stated that the source for most of his data was the "U.S. Department of Labor Periodic Surveys, the data that U.S. Publishing reports is collected off the data from the U.S. Department of Labor's data collection." (AR 93.)

The conversation continued:

Q       Now, do those jobs that you identified include SVP 3 jobs?

A       A few of them do. Well, no, I'm sorry, none of the ones that I've included here include SVP – well, they may. They may. Let me see how they were reporting in 1995. Currently in entry level jobs, they do report SVP 3 level jobs. They were doing the same in 1995, so the answer is yes.

Q       So unknown number of SVP 3 jobs included in there?

A       Correct.

(AR 93.)

The Plaintiff interprets this to mean that the numbers of jobs available provided by the VE are not reliable because they include an indeterminate number of SVP-3 jobs. The Commissioner, and the ALJ, apparently interpreted the same colloquy to mean that the referenced jobs include SVP-2 and SVP-3 positions within the referenced categories – so that, for example, some teachers' aide jobs may be classified as unskilled and some may be classified as semi-skilled – but that the jobs identified by the ALJ were all at the unskilled level.

---

Dr. Hill also filled out a Mental Capacities Evaluation in November 2000 in which he indicated that as of that particular day, Plaintiff had moderate to marked limitations in several areas. The psychiatrist also, as mentioned above, indicated that the "[r]ecent denial of [Plaintiff's] disability claim has caused a setback in functioning," but that her prognosis was "excellent" and "wellness should be achievable soon." (AR 477.)

At a later point, Plaintiff's attorney pushed the VE some more on the source of his data:

Q      Okay.  Final Question.  Are there any – in addition to your personal experience, are there any reports, any sources of data, anything that you've relied on in coming up – identifying these jobs and these numbers?

A      I'm not sure I understand your question.

Q      Are there – I mean, we've got a hypothetical question with a fair number of different limitations.  Is there – what is the methodology for determining that the person could work these jobs in these numbers in addition to –

A      You mean with the numbers we've used for the total number of jobs available?

Q      Well. let me back up.  The numbers come from the Department of Labor ultimately, but as crunched, if you will, by the U.S. Publishing in its document, The Employment Statistics Quarterly; is that correct?

A      Yes.

Q      All right.  So that's where the numbers come from.  The conclusions that a person with all these limitations could perform these jobs is based on?

A      Two things:  One, by what the Dictionary of Occupational Titles says is necessary from the standpoint of skill and preparation and physical/exertional capability to perform these jobs, and secondly, my familiarity with these jobs and the kind of people that are not hired to perform them.

Q      Would there be any sort of document basis for your familiarity or a document – I mean, like in terms of jobs studies or any of that sort of business?

A      No.  I update my information periodically in the other work that I do for specific areas of the state.  Look for jobs, numbers of jobs, specific titles and specific education and physical requirements to kind of stay in touch with how the national figures that are reported for Tennessee are applied to the state.  So it's a matter of both hard data and experience.

Q      But there's not any job analyses or anything like that – besides what you've got distilled inside your head – and I'm not trying to belittle that – but that's what we've got.  We've got the DOT numbers as distilled and the Employment Statistics Quarterly and your personal experience and knowledge?

A      Right....

(AR 104–05.)

The Court finds that the evidence presented by the VE constituted substantial evidence upon which the ALJ was entitled to rely.  The VE specifically stated that each of the jobs he identified were "unskilled."  (AR 86–87.)  For instance, referring to the job of mail clerk, the VE stated unambiguously, "It's an unskilled job and it's light."  (AR 87.)  With respect to security guard jobs, he stated:  "[I]n the fourth quarter of '95, there were just under 7,000 security guard jobs in the state at the unskilled entry level, so about a third of that [after deducting those precluded based on the environmental limitations in

the ALJ's hypothetical] would be about 2,400, something like that."  (AR 87.)  As for the teacher's aide job:  "It's an unskilled job that exists for both sedentary and light job."  (AR 87.)  The "sedentary teacher's job" was "unskilled and it's sedentary."  (AR 88.)  As for the job of general office clerk, the VE specifically stated he was considering "only the unskilled entry level jobs" at both the light and sedentary levels.  (AR 88.)  Based on the VE's unequivocal testimony that he was considering only unskilled jobs at the sedentary and light levels that would accommodate a claimant with the limitations outlined in the ALJ's hypothetical, the Court finds that the ALJ was justified in interpreting the VE's testimony to mean what he said:  that the jobs he identified were those at the unskilled level, though jobs in those categories identified also existed at the semi-skilled level.  The Court rejects the Plaintiff's contention that the VE's testimony did not constitute substantial evidence and further finds that the ALJ was reasonable in relying on the VE's evidence to find that there was a substantial number of jobs in the national and regional economies that would accommodate the Plaintiff's vocations limitations from November 1994 through November 2000.

## VI.    CONCLUSION

For the reasons discussed above, the Court finds that the ALJ applied the appropriate legal standards in reaching his conclusion, and that his decision is supported by substantial evidence in the record.  An appropriate order denying Plaintiff's motion for judgment will be entered.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge